**ÆTNA LIFE INS. CO. v. DUNN et al.**

**No. 6030.**

Circuit Court of Appeals, Third Circuit.

June 19, 1936.

Charles W. Broadhurst, of Jersey City, N. J., for appellant.

John W. Palmer, of Newark, N. J., for appellees.

Before BUFFINGTON, Circuit Judge, and DICKINSON and FORMAN, District Judges.

BUFFINGTON, Circuit Judge.

In the court below Phyllis Dunn and Katherine Van Wagoner, citizens of New Jersey, brought suit and recovered verdicts against the Ætna Life Insurance Company, a corporate citizen of Connecticut, to recover damages for injuries suffered by them through the alleged negligence of Whitcomb Rummell, the driver of a car owned by Miss Mona K. Noble, a nurse employed at a hospital, who had an indemnity policy of said company. On entry of judgment, the insurance company took this appeal.

The policy provided: "IV. Additional Interests. While any automobile covered hereby is being used with the consent of the assured * * *, the provisions of this policy with respect to claims on account of damage to property of others or injury to the person and/or death of others, shall inure to the benefit of any person operating or riding in * * * said automobile * * *."

The basic question involved, as stated in appellant's brief, is: "1. Was the automobile insured, as a matter of law, at the time of the accident being used with the express or implied consent of the owner for the particular use to which it was being put?"

From the proofs it appears that Miss Noble and Rummell used her car when driving together on Friday. When they parted, Rummell, who lived some distance away, was allowed by her to take the car to his house and return with it on Sunday, when they arranged to take another drive. On Saturday Rummell drove the plaintiffs, two young ladies, to see a ball game, and on returning therefrom they were injured in a collision caused by Rummell's negligence. The court in its charge left to the jury the question whether, as provided by the policy, the automobile was at the time of the accident "being used with the consent of the owner," charging as follows:

"The policy, according to its provisions, protected the driver Rummell only while the automobile covered by the policy was being used with the consent of the owner, Mona Noble.

"For the use of the automobile to be with the consent of Mona Noble within the meaning and effect of the policy, the consent must have been given, impliedly at least, not only to the taking and use of

the car in the first instance, but also to the particular use being made of the car at the time of the accident in question.

"If the plaintiffs, therefore, have failed to prove by the greater weight of the evidence that the particular use of the car at the time of the accident by the driver Rummell was with the consent, impliedly at least, of the owner Mona Noble, they cannot recover, and your verdict must be for the defendant.

"Now, the plaintiffs contend that that consent existed by implication. The defendant denies it.

"You have heard the testimony of the witnesses and it is my view that there is an issue of fact on that question of implied consent for this particular purpose, and that issue, therefore, I am leaving to you. If you resolve it in favor of the plaintiffs, of course, you will award them the damages agreed upon, which are $3431.31 and $846.57."

The case, therefore, resolves itself into the question whether the trial judge should have given binding instructions for the defendant. In that regard the case turned on the testimony of Miss Noble and Rummell. The testimony of Rummell was as follows:

"Q. Between the time she got that automobile and up until the night of October 28 of 1933, how many times, about, if any, had she loaned you that automobile? A. I don't remember definitely. I would say fifteen, at least.

"By the Court: Q. Where was the car kept? A. She had a garage across the street from the hospital where she kept the car.

"Q. Just tell us some of the occasions that she would come to loan you the car at previous times. How would that come about? A. During the time that I knew her I didn't have a car, and when I went out with her at night, why, I would go home with it. We would stay in front of the hospital and she would ask me if I would like to take the car and call for her the next time.

"Q. Where did you take the car when you took it? A. I went home.

"Q. Did you leave it in front of your house? A. In the driveway or garage.

"Q. You had a garage with your house? A. Yes. * * *

"Q. You say you put Miss Noble's car in your garage? A. No.

"Q. In your driveway? A. Yes.

"Q. What was the longest period of time that you had ever kept that car previous to this accident? A. Well, one time we had some trouble with it. The connecting rods were broken and it took about a week to fix it.

"Q. At her garage? A. No, at my mechanic's place of business, and after that time and during the time it was fixed I had the car about approximately five days.

"Q. Where was it, in your garage? A. In the mechanic's place.

"Q. In your service station? A. No, at the mechanic's. You see, I took the car to the mechanic to have it fixed and he kept it at his place a day or so, and during that time the car was away from her. She left it with me to see that it was fixed, and immediately after that, there were other little things. I would have a date with her and would get the car and then go home with the car after I saw her.

"Q. Did you ever use it previously, to take other people about in? A. I don't remember definitely.

"Q. You must remember. Had you ever gone to football games in it before? A. No.

"Q. Had you ever had other guests in it before? A. Yes, I think so.

"Q. Who? A. Members of my family.

"Q. Members of your own family? A. Yes.

"Q. Where did you take them? A. Down to the village, shopping.

"Q. In South Orange? A. Yes. * * *

"Q. Who paid for the gasoline? A. Well, I put some in and she would put some in.

"Q. There was no established custom? A. No.

"By Mr. Palmer: Q. What Judge Clark asked you and what I would like to clear up, too, Mr. Rummell, is, before the night of this accident when she had loaned you the car, how long would you keep it? I know it would be different lengths of time. How long was the greatest time you had it? A. Five days.

"Q. I mean when she would loan you the car, how long would you keep it at home? A. Two or three days. * * *

"Q. Now, when you would return the car and in the course of conversation did

754

you ever tell her the uses to which you were putting the car? A. Yes, sir. * * *

"Q. Now, before you separated that evening, you and she, what, if anything, did she say to you about using the automobile? A. She asked me if I wanted to take the car and keep it over the week-end.

"By the Court: Q. Did you tell her you were going over to take a couple of other girls out to a football game? A. I had no plans at that time. * * *

"By Mr. Palmer: Q. What I want you to tell us, Mr. Rummell, any of those ten or fifteen times that she had ever loaned you the car, did she ever restrict you in its use? Did she tell you you could do certain things or not to do certain things? A. No.

"Q. She just loaned it to you? A. Yes.

"Q. In return for her leaving the car for you to use, did you do anything for her?

"Mr. Broadhurst: I object to 'in return for.'

"Q. At times when she was loaning you the car this way, did you ever do anything for the benefit of the car without her asking you to do it? A. Yes.

"Q. Such as what? A. Well, I kept it greased and oiled. I changed the oil and put in gasoline. I worked at the service station and sometimes I would have free time on my hands and the car would be standing there and I would tighten up on things.

"Q. What did you say when she said you could have the loan of the car over the week-end? A. I said yes.

"Q. Then what did she then do? A. She gave me the registration card, and the keys were already in the car, and, as she was getting out of the car, it stalled, and she asked me to see if I couldn't do anything to prevent stalling?

"Q. She said the car had been stalling? A. Yes, I noticed it that day, in fact, myself.

"Q. The next day, or later on that day, because it was early Saturday morning, did you make any efforts to overcome the stalling of the car, to fix it? A. Yes, in the morning I took out the plugs and cleaned them and fooled around with the carburetor and adjusted the carburetor and I think I cleaned the points. * * *

"Q. Let me ask you this question again, so there will be no possible confusion:

Will you state to me what Miss Noble said to you between 2:30 and 3 A. M. on the night that you left her at the hospital, just tell me what she said to you and you said to her about the use or possession of the car. A. She said, as far as I remember definitely now, she asked me if I wanted to take it and use it. I don't know whether she said the week-end, or bring it back Sunday. I knew definitely I was to bring it back Sunday."

In contradiction, Miss Noble testified she had not told Rummell he could use the car. In that respect her testimony was:

"Q. It has been testified in this case that previous to this occurrence Mr. Rummell had used your car—had the use of your car—some ten or fifteen times, I think he testified. What, according to your recollection is the number of times that you had let him use the car? A. I would say not more than three or four times. * * *

"Q. Without going into all the niceties of a young man saying good-night to his girl friend, and limiting myself particularly to the conversation that was had as to his leaving you and taking the car with him that Friday night, will you tell me what in substance, as near as you can remember, was said by you to him and he to you about his using the car? A. Well, I told him he could take the car home and he could bring it back to me Sunday when he came.

"Q. How did you know he was coming back Sunday? A. Well, we had made a previous date for Sunday.

"Q. And was there any time fixed for that previous date? A. No.

"Q. Well, how was the time to be arrived at? A. He was supposed to call me Sunday and I could tell him what time I was off duty.

"Q. That is, your hours of duty at the hospital are not fixed every day the same? A. No, they are not.

"Q. I must not lead you and I must not suggest anything to you, so what else was said, what was said if anything in regard to repairs to the car? A. Nothing that I can recall.

"Q. Did you say to Mr. Rummell that he could use the car over the week-end? A. I did not. * * *

"Q. Now, when Mr. Rummell left you that night and you gave him your car, you gave him also your registration? A. I gave him my registration, yes.

"Q. You always did that, didn't you? A. I loaned it to him three or four times and at those times I did that.

"Q. Did you give him the keys to the car? A. Well, you would have to have them.

"Q. You gave them to him, didn't you? A. Yes."

After argument and due consideration of this and the other questions raised in the case, we are of opinion the court committed no error in refusing to take the case from the jury, and so holding, the judgments below are affirmed.